[Civ. No. 50212. Second Dist., Div. One. Jan. 12, 1978.]

GREEK THEATRE ASSOCIATION, Plaintiff and Respondent, v. COUNTY OF LOS ANGELES et al., Defendants and Appellants.

770

### COUNSEL

Evelle J. Younger, Attorney General, Philip C. Griffin and Patti S. Kitching, Deputy Attorneys General, John H. Larson, County Counsel, and Melissa A. Taubman, Deputy County Counsel for Defendants and Appellants.

Mitchell, Silberberg & Knupp, John L. Nourse, Thomas P. Lambert and Judith N. Levy for Plaintiff and Respondent.

Heller, Ehrman, White & McAuliffe, Paul J. Mundie, Paul Alexander, Ronald T. Astin, Richard B. Isham, Ehrich, Allison, Rovens & Sparks, John R. Sparks, Musick, Peeler & Garrett, James E. Ludlam, Dinkelspiel, Pelavin, Steefel & Levitt, Thomas B. Donovan, Lawrence E. Wayte, Rutan & Tucker and Roger A. Grable as Amici Curiae on behalf of Plaintiff and Respondent.

### OPINION

**THOMPSON, J.**—This appeal primarily raises the applicability of the "welfare exemption" from property taxation to facilities used by a nonprofit corporation for theatrical and musical presentations by professional performers. Compelled by the broad rule of decision employed in *Stockton Civic Theatre* v. *Board of Supervisors* (1967) 66 Cal.2d 13 [56 Cal.Rptr. 658, 423 P.2d 810], we conclude that the exemption is applicable to property of plaintiff-respondent. We conclude, also, that operation of a small bar for the convenience of theatre patrons which is incidental to the theatrical use of the property does not prevent the welfare exemption from applying. Finally, we note, for what the comment may be worth to our Supreme Court on a petition for hearing, that changed conditions may have rendered the broad rule of *Stockton Civic Theatre* no longer suitable.

### Facts

The trial court found that all of the requirements for the Revenue and Taxation Code section 214 welfare exemption are satisfied in the case at

bench. We recite the record resolving all conflicts in the evidence and accepting all reasonable inferences in favor of those trial court findings. (*Crawford* v. *Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183]; *Foreman & Clark Corp.* v. *Fallon* (1971) 3 Cal.3d 875, 881 [92 Cal.Rptr. 162, 479 P.2d 362].)

Greek Theatre Association is a California nonprofit corporation. It was formed to fill an existing void in the presentation of opera and ballet in the Los Angeles area. The association's corporate purpose is "[t]o maintain, sponsor, promote, produce, present . . . or generally engage in the production or presentation of, any musical, cultural or educational activity . . . including but not limited to symphony orchestras, operas, concerts, recitals, dramas, comedies, ballet and pageants . . . ." From its inception, the association has qualified as an exempt organization for the purposes of the Internal Revenue Code and California Franchise Tax Law.

Beginning in 1953, the association leased from the City of Los Angeles "The Greek Theatre," an outdoor theatre in Griffith Park. For a number of years, the association presented ballet and opera plus an occasional "musical."

In 1964, the Huntington Hartford Theatre, a Los Angeles house presenting Broadway-type plays, was about to be closed. To preserve that center of theatre, the association purchased the Huntington Hartford, borrowing funds for the purpose. After the association's acquisition of the Huntington Hartford Theatre, Broadway-type productions continued to play there.

In the years subsequent to 1953 to the time of trial, Greek Theatre Association received financial support from the City and County of Los Angeles in an amount exceeding $600,000. Private contributions to the association also exceeded $600,000. The association could not have continued its operation without the benefit of the public and private subsidy.

In 1968, the State Board of Equalization ruled that Greek Theatre Association was entitled to the welfare exemption from property taxation as to its leasehold interest in the Greek Theatre in Griffith Park, its interest in the Huntington Hartford, and its personal property.

By the 1972 tax year, the mix of attractions at the Greek Theatre had changed from those presented in the first years of operation. Because of rising production cost of opera and ballet contrasted with the revenue generated by that form of entertainment, it had become necessary for the financial survival of the association that it produce, in addition to ballet and opera, other more popular forms of entertainment. In the calendar year 1972, productions at the Greek Theatre included two operas, concerts of modern classical music, four separate popular music concerts, concerts of folk music, and rock concerts by one group. In the 1973 calendar year, the attractions at the Greek Theatre included performances by the New York City Ballet, productions of the Peking Opera, performances by the Red Buddha Theatre of Japan, performances by popular singers, and performances by comedians. The mix of performances at the Greek Theatre has been substantially the same in other recent years.

Performers at the Greek Theatre and the Huntington Hartford are professionals. Generally, they are paid the customary performance fee although on occasion a popular performer appears for less but never for more. Performances, particularly at the Huntington Hartford, are publicized to increase attendance, and on most occasions the name of the star is included in the publicity. Substantial expenses for publicity were incurred in the tax years in issue. No person received excessive compensation for services to the association. "Attraction costs," i.e., the gross amount paid to the performing company, are the greatest single item of expense of the association.

A bar is maintained within the Huntington Hartford as a convenience to patrons of the theater. Members of groups sponsoring and raising public donations for the association receive preference in seating on the purchase of tickets at the normal price. The members also are permitted to attend social events related to the productions. A small number of complimentary tickets are furnished to local office holders, the press, the performing companies, and employees of the association.

The association makes available a large number of tickets at no charge to children and economically disadvantaged persons, and still more tickets at a reduced or service charge to groups of persons that might not otherwise attend performances.

The association maintains its accounts on a September fiscal year. Contributions aside, the Greek Theatre and Huntington Hartford operations for the fiscal periods 1970 through 1974 disclose the following results:

| Year | Greek Theatre | Huntington Hartford |
| --- | --- | --- |
| 1970 | ($148,864) loss | ($35,803) loss |
| 1971 | $42,477 gain | $99,893 gain |
| 1972 | ($54,618) loss | ($163,942) loss |
| 1973 | ($399,997) loss | $149,958 gain |
| 1974 | ($336,586) loss | ($7,377) loss |

In 1971, the State Board of Equalization reversed its former position and determined that the association was no longer entitled to a welfare exemption of its property. Taxes assessed for the tax years 1972-1973 and 1973-1974 were paid by the association under protest. Having exhausted its administrative remedies, the association sued for a refund of taxes paid and for a declaration that it is entitled to the welfare exemption.

The trial court held in favor of the association. This appeal followed.

### Statute

Revenue and Taxation Code section 214 states in pertinent part: "Property used exclusively for . . . charitable purposes owned and operated by . . . corporations organized and operated for . . . charitable purposes is exempt from taxation if:

"(1) The owner is not organized or operated for profit . . .;

"(2) No part of the net earnings of the owner inures to the benefit of any private shareholder or individual;

"(3) The property is used for the actual operation of the exempt activity, and does not exceed an amount of property reasonably necessary to the accomplishment of the exempt purpose;

"(4) The property is not used or operated by the owner or by any other person so as to benefit any officer, trustee, director, shareholder, member, employee, contributor, or bondholder of the owner or operator, or any other person, through the distribution of profits, payment of excessive charges or compensations or the more advantageous pursuit of their business or profession;

"(5) The property is not used by the owner or members thereof for . . . social club purposes except where such use is clearly incidental to a primary . . . charitable purpose;

"(6) The property is irrevocably dedicated to . . . charitable purposes . . .;

"(7) . . . . . . . . . . . . . . . .

"The exemption provided for herein shall be known as the 'welfare exemption.' . . ."

The statutory scheme thus: (1) exempts from ad valorem taxation property owned by "charitable" organizations which is used "exclusively" for charitable purposes; and (2) restricts the availability of the exemption by a series of conditions that must be met by the one who claims it.

### Controlling Precedent

Our application of the statutory scheme to the case at bench is governed by the approach adopted by our Supreme Court in analogous situations. (*Auto Equity Sales, Inc.* v. *Superior Court* (1962) 57 Cal.2d 450 [20 Cal.Rptr. 321, 369 P.2d 937].) ▮▮ The high court treats the term "charitable" as one to be broadly construed in favor of the welfare exemption (*Stockton Civic Theatre* v. *Board of Supervisors, supra,* 66 Cal.2d 13, 18), and the word "exclusively" as not precluding activity which, while not charitable in the traditional sense, is merely incidental to the charitable purpose and not in competition with commercial enterprise (*Y. M. C. A.* v. *County of L. A.* (1950) 35 Cal.2d 760 [221 P.2d 47]). It considers the statutory conditions as the safeguards against an overly encompassing application of the broad definitions. (*Stockton Civic Theatre* v. *Board of Supervisors, supra,* 66 Cal.2d at p. 22.)

As adopted by our Supreme Court, the broad definition of "charitable" includes a "wide range of activities beneficial to the community." (*Id.,* at p. 20.) The term embraces "educational purposes." The primary test is whether the activity promotes a general community benefit whose "ultimate recipients [are] either the community as a whole or an unascertainable and indefinite portion thereof." (*Id.,* at pp. 19-20.)

Accordingly, our Supreme Court has held that the welfare exemption of Revenue and Taxation Code section 214 applies to a civic theatre presenting amateur performances of plays, musicals, light opera, and operetta to which the public is admitted by ticket purchases. While noting the educational element of the operation to the amateur participants, our high court does not rest its decision on that point. It does not approach the matter by reasoning that education and entertainment of the customers of the theater is merely incidental to the education of the performers. Rather, it also finds an equal charitable use of the theatre in the educational and recreational benefit to the customers through viewing of the performances, a use which the high court finds akin to activities "often supported by government, as witness the opera houses, municipal auditoriums, and orchestras maintained or supported by our cities." (*Stockton Civic Theatre* v. *Board of Supervisors, supra,* 66 Cal.2d 13, 20.)

### Charitable Purpose of Association and Charitable Use of Its Property

■ The purpose of the association to supply the community with the opportunity to view opera, ballet, musical productions, drama, and comedy meets the test of charitable purpose applied by our Supreme Court in its rationale of decision in *Stockton Civic Theatre.* The general community and not an identifiable portion of it is afforded the requisite educational-recreational opportunity akin to that granted by a governmentally maintained or supported "opera house."

The County of Los Angeles and State Board of Equalization argue that the charitable purpose is absent from the case at bench because of the presentation of professional as opposed to amateur entertainment with the consequent compensation to professional entertainers using the

facilities of the association. Granted that on its facts *Stockton Civic Theatre* does not involve the element of professional entertainment, that proposition is not the basis of the high court's decision. To the contrary, the *Stockton Civic Theatre* court cites in support of its result *Nixon* v. *Brown* (1923) 46 Nev. 439 [214 P. 524]. *Nixon* finds a charitable purpose in a gift in trust of the Winnemucca opera house, an elaborate theater which furnished "a means which the people of Winnemucca otherwise would not have had for attending plays, concerts, and other functions, thereby increasing to some extent their happiness and social welfare." (214 P. at p. 531.)

The *Stockton Civic Theatre* approach is by no means a unique one. It accords with the construction given section 501(c)(3) of the Internal Revenue Code. (26 U.S.C. § 501(c)(3).) That statute exempts from income tax nonprofit entities "organized and operated exclusively for . . . charitable . . . or educational purposes . . . ." Rulings construing section 501(c)(3) find qualified, pursuant to the section: (1) an "organization to foster the development in the community of an appreciation for the drama and musical arts by sponsoring *professional* presentations, such as plays, musicals, and concerts" (Rev. Ruling 73-45, italics added); (2) an organization supporting the development of the American theatre in places outside the metropolitan area of New York so that its benefits may inure to a greater segment of the American people (Rev. Ruling 64-174); (3) an organization whose main activity is producing plays and making the classic works of the theatre available in cities and colleges throughout the United States by means of a permanent touring repertory company "of the highest *professional* standards" (Rev. Ruling 64-175, italics added); and (4) a nonprofit organization created "to stimulate interest in and to gain a wider acceptance of jazz music as an American art form through the presentation of concerts" (Rev. Ruling 65-271).

In sum, production or presentation of professional theatre and musical attractions by a nonprofit organization is a charitable-educational activity within the tax exemption provisions of the Internal Revenue Code. (See *Broadway Theatre League of Lynchburg, Va.* v. *United States* (W.D.Va. 1968) 293 F.Supp. 346.)

Bound by the rationale of decision of *Stockton Civic Theatre* as reinforced by the interpretation of analogous federal law, we conclude

that Greek Theatre Association was organized and is operated for charitable purposes as the term is used in Revenue and Taxation Code section 214.

The same reasoning impels the conclusion that the leasehold interest in the Greek Theatre, the property constituting the Huntington Hartford, and the personal property of the association are used for charitable purposes as charitable purposes have been defined by the California high court.[1]

The State Board of Equalization and the County of Los Angeles argue that nevertheless the property is not used exclusively for that purpose. They focus on the presence of the bar at the Huntington Hartford and the benefit to the professional companies and artists using the facilities of the association. The argument ignores the definition given the term "exclusively" by compelling precedent.

"[T]he phrase 'property used exclusively for . . . [charitable] . . . purposes' [is] held to include any property which is used exclusively for any facility which is incidental to and reasonably necessary for the accomplishment of [the charitable] purpose []; or, in other words, for any facility which is reasonably necessary for the fulfillment of a generally recognized function of a complete modern [facility]. . . ." (*Cedars of Lebanon Hosp.* v. *County of L. A.* (1950) 35 Cal.2d 729, 736 [221 P.2d 31, 15 A.L.R.2d 1045].)

Thus property devoted by a hospital to housing of nurses and other hospital personnel for a fee and tennis courts maintained for the use of hospital personnel are deemed used for the hospital's charitable purpose although not indispensable to it. (*Id.,* at pp. 739-742, 744-745.) Dormitories maintained and operated for rental to tenants by a Y.M.C.A. are incidental to its charitable purpose. (*Y. M. C. A.* v. *County of L. A., supra,* 35 Cal.2d 760, 767-772.) A snack bar, gift shop, and beauty shop located on church property used as a retreat which serve the convenience of persons assembled for religious purposes and which are not open to

---

[1]The county and board argue that the board's administrative construction denying the welfare exemption is to be given great weight as precedent. The argument ignores the proposition that the board has, at different times, adopted inconsistent constructions.

the public are similarly treated as incidental to the primary religious purpose of the organization and hence qualified for the welfare exemption. (*Saint Germain Foundation* v. *County of Siskiyou* (1963) 212 Cal.App.2d 911, 917 [28 Cal.Rptr. 393]; accord see Note, 69 A.L.R.2d § 25, pp. 926 et seq.)

Where, however, the activity which *is not indispensable to the* charitable purpose is open to noncharitable public patronage, it is not used *exclusively* for a facility which is incidental to the accomplishment of the purpose. Thus, property used as a "thrift shop" located in a hospital does not qualify for the welfare exemption. (*Cedars of Lebanon Hosp.* v. *County of L. A., supra,* 35 Cal.2d 729, 745.) Neither does Y.M.C.A. property used as a restaurant serving both nonresidents and residents, as a meeting hall rented to outside groups, and as a barber shop, valet shop, and store available for public patronage qualify for the welfare exemption. (*Y. M. C. A.* v. *County of L. A., supra,* 35 Cal.2d 760, 772-776.) The availability of the facilities to the public places them in commercial competition so that their activity must be classified as commercial rather than charitably incidental.

Here the bar at the Huntington Hartford is maintained within the interior of the theatre. It is not open to persons who have not been admitted to performances. Substantial evidence in the record supports a trial court determination that the bar is reasonably necessary for the fulfillment of a generally recognized function of a complete modern theater. In those circumstances, the record compels the conclusion that the bar is used exclusively for a purpose incidental to the charitable function of the Huntington Hartford and hence qualifies for the welfare exemption.

The professional advantage to performers and performing companies through the use of the facilities of the Greek Theatre and Huntington Hartford does not in context compel the conclusion that the properties are not used for charitable purpose as that purpose has been defined in the case law. Property utilized to present professional entertainment is deemed used for a charitable purpose. Professional entertainment necessarily contemplates that the professionals will be paid and promote their careers through performing.

*Conditions to Entitlement
to Welfare Exemption*

While arguing that the purpose of the Greek Theatre and Huntington Hartford are not charitable in character, the County of Los Angeles and State Board of Equalization do not question that the association's property is irrevocably dedicated to the theatrical purpose. They do contend that the association fails to meet other conditions imposed by Revenue and Taxation Code section 214 upon the availability of the welfare exemption.

■ *Organization and operation for profit.* The County of Los Angeles argues that because a purpose of the association is to "produce revenue" at the Greek Theatre and Huntington Hartford, the association is organized and operated for profit and hence not entitled to the welfare exemption because it does not meet the condition imposed by subdivision (1) of Revenue and Taxation Code section 214. The State Board of Equalization adds the argument that the association does not meet the condition because some individual attractions are produced with the expectation of profit. The arguments lack merit.

Prior to 1953, Revenue and Taxation Code section 214 contained, in subdivision (1), language equivalent to the present wording. It also contained in subdivision (3) language imposing the condition that: "The property is not used or operated by the owner or by any other person for profit regardless of the purposes to which the profit is devoted. . . ." Our Supreme Court considered the qualification of hospital property for the welfare exemption under the pre-1953 version of section 214 where the hospital was concededly operated to generate net profit sufficient to discharge a bonded indebtedness on its property. Stating that "If subdivision three had been omitted, it might well be argued that the Legislature intended that the nonprofit conditions of subdivision one would be satisfied so long as none of the 'net earnings' inured to the benefit of any private individual," the high court determined that the presence of subdivision (3) compelled the conclusion that the operation of the hospital to generate a net profit to discharge the bonded indebtedness disqualified it from the welfare exemption. (*Sutter Hospital v. City of Sacramento* (1952) 39 Cal.2d 33, 38-39 [244 P.2d 390].)

In 1953, the year following the Supreme Court's decision in *Sutter Hospital,* the Legislature amended Revenue and Taxation Code section 214 to eliminate the language used by the high court to deny the welfare exemption by reason of the generation of profit. (Deering's Cal. Codes Ann., Rev. & Tax. Code, § 214.) It reworded subdivision (3) to require that the property be "used for the actual operation of the exempt activity."

The 1953 amendment is a clear legislative reaction to *Sutter Hospital.* It evidences a legislative intent adopting the reasoning of the Supreme Court in *Sutter Hospital* that, absent the language which the Legislature subsequently eliminated, "the nonprofit conditions of subdivision one [are] satisfied so long as none of the 'net earnings' inure[] to the benefit of any private individual." (*San Francisco Boys' Club, Inc.* v. *County of Mendocino* (1967) 254 Cal.App.2d 548, 558-559 [62 Cal.Rptr. 294].)

Here the record contains substantial evidence that none of the association's net earnings inure to the benefit of anyone other than the association. It establishes, further, that there are no net earnings over any period of time. While an individual performance may show a surplus of revenue over expense and an individual year may be profitable, over the long pull the association cannot exist without governmental financial assistance and private contributions. In these circumstances, the association is not organized or operated for profit as that terminology is used as a disqualifying condition in subdivision (1) of section 214. (*Fifield Manor* v. *County of Los Angeles* (1961) 188 Cal.App.2d 1, 20 [10 Cal.Rptr. 242].)

■ *No part of net earnings to inure to the benefit of any private individual.* The County of Los Angeles and State Board of Equalization inferentially assert that net earnings of the association inure to the benefit of the professional performers. The argument is a reprise of that asserted for the proposition that the purpose of the association is not a charitable one. Our reasoning in the segment of this opinion finding the purpose to be charitable disposes of the contention.

*Excess property.* The board and county assert that the association fails to meet the condition of subdivision (3) of section 214 because the bar at the Huntington Hartford exceeds property reasonably necessary to the accomplishment of the exempt purpose. Again we have discussed that contention asserted in different garb in relation to arguments that the

association's property is not devoted exclusively to its charitable function. Our reasoning there dictates rejection of the contention here.

■ ■ *Use of property for private benefit.* The board and county contend that contrary to the condition imposed by subdivision (4) of section 214, the Greek Theatre and Huntington Hartford properties are used to benefit performers and contributors "through the distribution of profits . . . or compensations or the more advantageous pursuit of their business or profession." They argue that preferential seating to patrons and complimentary tickets to local governmental officials and association employees is a form of compensation and that performers are given a professional advantage of a place to perform and publicity of their appearances.

The record is clear that patrons who contribute to the association, while receiving preferential seating, pay full price for their tickets. The preference cannot be construed as compensation. While employees of the association sometimes receive complimentary tickets, the record is also clear that they are not excessively compensated. It is only excessive compensation that triggers the condition. The record is also clear that the furnishing of complimentary tickets to local governmental officials is directly related to the receipt of government support and is not for the purpose of compensation to the officials.

True enough performers at the theaters receive the opportunity of advantageous pursuit of their profession. But the condition of subdivision (4) does not preclude that opportunity. The condition applies to bar the welfare exemption only when the private person is given a *"more* advantageous" opportunity. Here the record is clear that the professional performers receive no more compensation or publicity than that which they customarily receive and sometimes receive less.

■ *Purpose as social club.* Finally, the County of Los Angeles and State Board of Equalization assert that the opportunity of contributing patrons and members of support groups to participate in social activities incident to performances disqualifies the properties for the welfare exemption because they are used as a social club. The argument lacks merit. The disqualification from the welfare exemption exists because of subdivision (5) of section 214 only when the social club use is not clearly incidental to a primary exempt purpose. Here the record completely

supports a trial court determination that the minor social activity is clearly incident to the primary charitable purpose of the association.

## Conclusion

We thus conclude that, as the California law now exists, the trial court properly determined on the record before it that the properties of the association qualify for the welfare exemption of Revenue and Taxation Code section 214.

## Changed Conditions

While the judicial pyramid does not permit us to do so (*Auto Equity Sales, Inc.* v. *Superior Court, supra,* 57 Cal.2d 450), there is reason to reconsider the broad scope of the rule of *Stockton Civic Theatre.* The decision itself has received at least one bad review. (Comment, *The California Welfare Exemption* (1968) 41 So.Cal.L.Rev. 844.) Current legal scholarship questions the grant of governmental subsidies disguised in the form of exemptions from taxation so as to be immune from the normal processes of political accountability for open tax supported grants. (See, e.g., Comment, *Tax Exempt Real Property in California A Return to the Tax Rolls* (1972) 4 U. West L.A. L.Rev. 20; Comment, *Toward Optimal Land Use: Property Tax Policy and Land Use Planning* (1967) 55 Cal.L.Rev. 856; Reiling, *Federal Taxation: What is a Charitable Organization?* (1958) 44 A.B.A.J. 525.)

Show business has also changed since the time of *Stockton Civic Theatre.* Unquestionably, some forms of show business are now big business, performable in California without the aid of the facility furnished by a frontier style, community-supported opera house. Radio, television, and the hi-fi system have created a cultural milieu in which the popular performer needs a subsidized place to perform like an Arab sheik needs more oil.

If we were not precluded by *Auto Equity Sales, Inc.* v. *Superior Court, supra,* 57 Cal.2d 450, we would apply a narrower test of charitable activity than did our Supreme Court in *Stockton Civic Theatre.* We would limit the definition of presentation of theatrical performances as charitable endeavor to those performances of a character which traditionally have not been financially self-supporting and thus have required the existence of public or private contributions if they are to be

performed. As we construe *Stockton Civic Theatre,* that option is not open to us. Change in the rule, if it occurs, must come from the Supreme Court.

### Disposition

The judgment is affirmed.

Wood, P. J., and Hanson, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied March 30, 1978. Mosk, J., did not participate therein.